LEGGAT, RESPONDENT, *v.* LEGGAT ET AL., APPELLANTS.

[Submitted February 7, 1893. Decided February 12, 1894.]

FRAUDULENT CONVEYANCES—*Attorney in fact—Collusion.*—A conveyance will be set aside as fraudulent, where it appeared that the plaintiff had, at the instance of one brother-in-law, appointed another brother-in-law her attorney in fact, and that the latter had then conveyed her interest to the former for a grossly inadequate consideration, which was accepted by plaintiff in ignorance of the facts, she having reposed entire confidence in them, and having no other source of information, and they, acting in collusion, had concealed from her the value of the property, and falsely represented the title to be in litigation, and the property to become a source of expense, while in fact it was yielding considerable revenue, and its title virtually unassailable.

SAME—*Defense—Evidence.*—A claim of equitable ownership of such property by the defendant, he alleging to have originally conveyed it to plaintiff's husband as security for a loan, is contradicted by evidence that the property was purchased by him from defendant for several thousand dollars; that thereafter he had for several years paid his proportion of the expense of annual representation, which expense also included items for personal services by defendant, and that defendant, in his letters to plaintiff, referred to plaintiff's interest as "your interest" in the property, and at the time it was conveyed to plaintiff by her husband through defendant he asserted no claim to it.

SAME—*Ratification—Evidence.*—Evidence that defendant immediately after purchasing the property had written to plaintiff, informing her of the sale, and referring to lawsuits affecting the property, saying, "The third interest I bought from you I deeded to Alex for a loan of two hundred dollars, which I sorely needed," and thereafter had sent her a portion of the money, which she received and retained for several months without repudiating the sale, although in possession of letters from defendant, tending to show that he was not the equitable owner of her property, is insufficient to show a ratification of such sale by plaintiff with full knowledge of the facts.

*Appeal from Second Judicial District, Silver Bow County.*

ACTION to annul fraudulent conveyance. Judgment was rendered for plaintiff below by McHATTON, J. Affirmed.

*Forbis & Forbis,* for Appellants.

I. It is a well-settled rule of law, that one who alleges actual fraud against another must prove the fraud as alleged, and that relief will not be granted upon the proof of constructive fraud, or upon proof of any other fraud than that alleged in the complaint. (Kerr on Fraud and Mistake, 382, 383, and note; 1 Daniell's Chancery Practice, 327, 328, 383, and note; *Eyre* v. *Potter,* 15 How. 42; Bigelow on Fraud, 465; *Mercier* v. *Lewis,* 39 Cal. 532; *Leighton* v. *Grant,* 20 Minn.

345; *Collins* v. *Jackson*, 54 Mich. 186, 190; *Barnes* v. *Quigley*, 59 N. Y. 265; *Burnham* v. *Noyes*, 125 Mass. 85.) John A. Leggat made no false representations to the plaintiff. He did not induce her to appoint R. D. Leggat as her attorney, but in fact recommended other parties. There is no proof of any collusive conduct between John A. Leggat and R. D. Leggat. The complaint does not allege sufficient to show a fiduciary relation existing between plaintiff and defendant John D. Leggat, nor does the proof show it. In matters of this kind the brother-in-law, we think, does not stand in a fiduciary relation to the sister-in-law, and that merely doing friendly offices, as was the case on the part of John A. Leggat toward the plaintiff, does not constitute a fiduciary relation, and if there was no fiduciary relation then there is nothing in the fact that title to property has been misrepresented, even if a misrepresentation as to the title could be shown. (*Robins* v. *Hope*, 57 Cal. 493.)

II.   It is also a well-settled rule of law, that where a party has been defrauded as the plaintiff claims she was in this case she must use diligence in disclaiming the transaction when it is discovered, and that she must do nothing to ratify or confirm it after the facts are brought to her notice. Plaintiff did not contradict the statements of John A. Leggat as to the condition of affairs between himself and plaintiff's husband, nor did she disclaim the action of her attorney in making the sale, but over two months afterwards received, without protest, the sum sent to her as the purchase price, and used it; and not until fourteen months after she had received the money did she disclaim the sale which had been made, although all of the evidence upon which she seeks to avoid a sale was, during the whole of this time, in her possession. The authorities upon this question are too numerous for citation, because we believe it is a universal rule of law, decided by almost every court, that the transaction must be repudiated with diligence if it was procured by fraud, and that any waiver or ratification of the fraud would preclude the party defrauded from seeking the remedy thereafter. (*Upton* v. *Trebilcock*, 91 U. S. 45; Bigelow on Fraud, 443; Kerr on Fraud and Mistake, 298 et seq.; *Sweetman* v. *Prince*, 26 N. Y. 224; *Saratoga etc. R. R. Co.* v. *Row*, 24 Wend. 74; 35 Am. Dec. 598; *Sanger* v. *Wood*,

3 Johns. Ch. 416; *Vernol* v. *Vernol*, 63 N. Y. 45; *Slaughter* **v.** *Gerson*, 13 Wall. 379; *Sample* v. *Barnes*, 14 How. 70.)

*William Scallon*, for Respondent.

I.   John A. Leggat stood in confidential relations to the plaintiff; his letters to the plaintiff, as well as his evidence, show that he acted about her property as her agent and manager, both before and after this transaction.   He alludes to the application for patent and entry of the claim.   He collected rents for her, sold some personal property, gave leases on claims, etc.   His management does not merit any commendation, but he did assume to manage plaintiff's properties in Montana; he assumed to act as her adviser and her confidential friend.   He promised repeatedly that he would assist and advise any attorney whom she might appoint, and suggested the name of R. D. Leggat.   Besides, R. D. Leggat's action in deeding this property to John A. Leggat was a clear violation of his duty—a fraud on the plaintiff.   John A. Leggat knew it, and took and reaped the benefit of it.   This makes him equally guilty with R. D. Leggat, even if there were no other act of fraud on his part.

II.   There was absolute fraud as shown by the concealment; the relations of the defendants; their relations to plaintiff; the alleged conversation between the defendants, and the manner in which the deed was given; the inadequacy of consideration; falsity of defenses; failure to consult plaintiff, or fairly state the case to her; and other circumstances, even irrespective of collusion—but there is collusion.   Where suspicious circumstances exist, inadequacy of consideration is almost conclusive evidence of fraud.   (*Cofer* v. *Moore*, 87 Ala. 705; *Weitzell* v. *Fry*, 4 Dall. 218; 2 Pomeroy's Equity Jurisprudence, § 927, note 2; Kerr on Fraud, 189; *Allore* v. *Jewell*, 94 U. S. 506; *Hallett* v. *Collins*, 10 How. 182; *Gruber* v. *Baker*, 20 Nev. 453.)

III.   "Collusion between two persons to the prejudice of a third is, to the eye of the court, the same as a fraud."   (Kerr on Fraud, 195, 270; *East India Co.* v. *Henchman*, 1 Ves. Jr. 288; note to *Potter's Appeal*, 7 Am. St. Rep. 279 et seq.) Nor does it make any difference that the agent or person in

confidential relations is a voluntary agent, or that no benefit is derived by him directly from the transaction. (Kerr on Fraud, 270; *Hunsaker* v. *Sturgis*, 29 Cal. 142.)

IV.  When any third person, even though a stranger, colludes with one in fiduciary or confidential relations to the plaintiff the case becomes one of constructive fraud; and the same burden is cast upon the third person as would be on an agent, and the case is governed by the rules applicable to constructive fraud. (Bigelow on Fraud, 2d ed., 1888, p. 576 et seq.; Mecham on Agency, § 797.) An agent who fraudulently and wrongfully transfers his principal's property to a third person who has knowledge or notice of the fraud, or to one who is not a *bona fide* purchaser for value, does not deprive the principal of his title to the property, nor bar his right of action to recover the property or its value from the person so receiving it.  (1 Wait's Actions and Defenses, 285; 1 Perry on Trusts, 4th ed., § 211.)

V.  The burden is upon the defendant to show that he dealt fairly with the plaintiff; that the latter was made fully acquainted with the value, and all of the circumstances and conditions of the property; that the price was fair, and that the defendant was guilty of no inequitable practices, or of concealment or misrepresentation; and that full disclosure was made to the plaintiff.  (1 Story's Equity Jurisprudence, 318; Bigelow on Fraud, 261–63, 296–99.)  That John A. Leggat sustained confidential relations to the plaintiff is shown by the following authorities, applied to the facts of this case: Bigelow on Fraud, 262; Kerr on Fraud, 183, 193; 2 Warvelle on Vendors, 866, note 5; Bishop on Contracts, § 740, note 6; wherein he quotes Seevers, C. J., in *Leighton* v. *Orr*, 44 Iowa, 679, to the effect that "it matters not what the relation is, if confidence is reposed and influence obtained." (2 Pomeroy's Equity Jurisprudence, §§ 951, 963; *Postor* v. *Balch*, 69 Mo. 123; *Bayliss* v. *Williams*, 6 Cold. 440; 1 Perry on Trusts, §§ 201, 204; *Huguenin* v. *Baseley*, 2 White & Tudor's Leading Cases in Equity, part 2, pp. 1233, 1234; *Hunsaker* v. *Sturgis*, 29 Cal. 142; note to *Potter's Appeal*, 7 Am. St. Rep. 279 et seq.)

VI.  Upon the facts of this case no laches or acquiescence can be imputed to the plaintiff.  Before laches can be imputed

the injured party must have acquired knowledge of the fraud, and have delayed an unreasonable time after the discovery; and he must have been fully apprised of all the facts relating to the fraud before he can be guilty of laches; and the discovery of only a part of the fraud is not sufficient. (12 Am. & Eng. Ency. of Law, 557, 558, 578, 604, 605; *Hallett* v. *Collins,* 10 How. 186; *Allore* v. *Jewell,* 94 U. S. 506–12.)   In this case six years held not a bar.   This action was brought within two years, and before the statute of limitations could possibly have run.   So laches cannot be imputed.   (Bigelow on Fraud, 23, 38–40; Kerr on Fraud, 300; 12 Am. & Eng. Ency. of Law, 545; 2 Pomeroy's Equity Jurisprudence, § 965, and note 2, toward end of note; *Lux* v. *Haggin,* 69 Cal. 267.)   The defense of laches is an affirmative one, and the burden is upon the defendant to establish it.   (Bigelow on Fraud, 136.)   The sale was one in which plaintiff might have acquiesced, but she did not do so.

VII.   The rule stated in *Robins* v. *Hope,* 57 Cal. 493—that a party is conclusively presumed to know the condition of his title to real estate—is not correct.   If correct, it would follow that there could be no relief granted for mistakes as to title, but such relief has many times been granted. (Kerr on Fraud, 398–401, 406, 413, 415; 1 Story's Equity Jurisprudence, § 122 and following, and 130; 2 Pomeroy's Equity Jurisprudence, 847, 848, and notes, 849, especially on p. 314; *Trigg* v. *Read,* 5 Humph. 529; 42 Am. Dec. 447; *Hallett* v. *Collins,* 10 How. 186; *Billings* v. *Aspen Min. etc. Co.,* 51 Fed. Rep. 338.)

HARWOOD, J.—Through this action plaintiff sought and obtained a decree annulling the sale, and canceling the conveyance, whereby defendant John A. Leggat acquired and held title to one-third interest in the Old Glory mining claim, situate near Butte City, in Silver Bow county, Montana, with provision for the restoration of said property to plaintiff, together with the rents and profits obtained therefrom by said defendant while he held the title thereto.   The annulled sale and conveyance were made by defendant Roderick D. Leggat, acting as attorney in fact for plaintiff.   The grounds for such relief, as alleged in the complaint, and affirmed by the decree,

were false and fraudulent representations and concealments by defendants, acting in collusion, concerning the value, and conditions affecting the value, of said property, whereby they betrayed the trust and confidence which plaintiff had been led to repose in them, and induced plaintiff to accept a grossly inadequate price for said property. From the decree, and the order of the court overruling defendants' motion for new trial, this appeal is prosecuted.

Appellants assign in their brief, and urge in argument, two propositions, on which they insist the judgment is not supported by the evidence, and for which reasons it should be reversed: 1. Because the alleged fraud is not proved as charged in the complaint; 2. Because the proof shows that plaintiff acquiesced in, approved, and ratified said sale and purchase, and received the price paid with full knowledge of all the facts in relation to said property on which she now predicates fraud, and seeks to avoid the transaction. The pleadings and proof must therefore be reviewed from the standpoint of these assignments.

During the times mentioned in these proceedings, plaintiff resided in the state of Missouri, while defendants, her brothers-in-law, resided at Butte City, state of Montana, very near the location of the property in question. Plaintiff sets forth in her complaint that on the 5th of May, 1888, and for two years prior thereto, she was seised in fee and possessed of an undivided one-third interest in and to a certain quartz lode mining claim, known as "Old Glory mining location," situate in said county, etc., giving particular description thereof. That on December 15, 1887, by power of attorney executed and delivered, she appointed and empowered defendant Roderick D. Leggat as her attorney in fact, to manage and sell certain of her real estate situate in Silver Bow county, Montana, and particularly her interest in said Old Glory mining claim, which power was accepted by Roderick D., and continued in force until revoked, in 1888. That such appointment was made because so advised by defendant John A., who, through his correspondence with plaintiff, had pretended to act as her friendly and confidential adviser in respect to her property and affairs in Montana, and particularly her interest in said lode claim, both before and after such appointment, whose state-

ments she believed, and whose counsel she trusted and relied upon, and because of her trust and confidence in both defendants as brothers of her late husband, Alexander J. Leggat. That on or about May 5, 1888, Roderick D., acting as plaintiff's said attorney, sold and conveyed plaintiff's one-third interest in said Old Glory mining claim to defendant John A., for $1,000, a greatly inadequate consideration, for said property was worth at least five times said amount, and was constantly increasing in value. That about the 23d of April, 1888, a short time prior to said sale to John A., a small portion of the surface, only, of said claim, without conveying any rights to the mineral therein, was sold and conveyed to Adam Farrady for $3,000, of which plaintiff's share was $1,500; and both defendants were parties to that conveyance, Roderick D. signing it as plaintiff's attorney in fact. That such fact was concealed from plaintiff by both defendants, and plaintiff discovered the same only within about two weeks before instituting this action. That none of her share of the proceeds of said sale to Farrady was accounted for or paid to her. That a large portion of the town of Centerville, in Silver Bow county, Montana, is built on said mining claim, and all, or nearly all, of the occupants thereof were paying, or had agreed to pay, ground rent to the owners of said claim, which ground rent was worth several thousand dollars per annum; and many valuable buildings are erected on said claim, which, as plaintiff is advised, become part of said property belonging to the owners thereof. That, in addition to the value of the surface ground, the vein of said mining claim is of considerable value. That, until a few weeks prior to the commencement of this action, plaintiff was in complete ignorance of the value of said property, its condition and title. That defendants were plaintiff's only source of information. That they, as plaintiff is informed and believes, and therefore alleges, confederated together for the purpose of concealing from plaintiff the value of said property, and misleading her concerning the same, and thereby to fraudulently induce plaintiff to accept for her interest a grossly inadequate sum; and that, pursuant to such collusion and conspiracy, defendant John A. several times wrote to plaintiff that said claim was the source of much annoyance and expense, was involved in

litigation, and the title thereto was doubtful, and that he was compelled to devote much time, labor, and money to protect the plaintiff's interest therein; and that defendant Roderick D. concealed the true facts in regard to said property from plaintiff, and gave her no correct information thereof. That such statements made by John A., and each and all of them, were false, and known by him to be false, except the statement that he pretended to manage said claim; for, in fact, when plaintiff's interest in said property was conveyed to John A., the title to said claim was good and uncontested, and the ground rents for the occupied portions thereof were of great value, as aforesaid, besides the value of the claim itself, and the value of said property was constantly increasing, as defendants well knew. That such sale of plaintiff's interest was made by Roderick D. to John A., without the knowledge or consultation of plaintiff; but afterwards plaintiff was informed of such sale by letters received from each of the defendants, wherein they stated that $1,000 was all that plaintiff's interest was worth, and that the title thereto was doubtful and in litigation, or threatened with litigation, which statements were false, as both defendants well knew; but plaintiff then relied upon and believed said statements, and, being deceived thereby, was induced to accept $1,000 for said property, whereby defendants defrauded plaintiff, and deprived her of many thousands of dollars of value in said property. That plaintiff only discovered such fraud a few weeks prior to the commencement of this action. That she then tendered back to John A. the sum paid for her interest in said property, with interest since payment, and demanded a reconveyance thereof to her, all of which was refused. That while defendant John A. has held title to said property he has received rents and profits thereof to a large amount, for which plaintiff asks an accounting and judgment, together with a decree compelling the restoration of said property to her.

Defendants made separate answers to the complaint, but very similar in substance. There is no denial of the transfer of said property by Roderick D., acting as plaintiff's attorney in fact, to John A., for $1,000 consideration; nor denial that plaintiff's interest in said property was worth upwards of five

times that sum; nor that defendants were unacquainted with its value, or the circumstances which enhanced its value. As to the alleged sale of a small portion of the surface of said claim to Farrady, it is denied that the proportion of the proceeds of that sale due to plaintiff's interest amounted to $1,500, or any sum greater than $1,000. But defendants specifically deny all the material allegations of the complaint charging them with false representations and fraudulent concealments in reference to said property; and by way of new matter of defense, in support of the good faith of the transaction, defendants allege that John A. Leggat was in fact the equitable owner of said interest during all the time the legal title thereof was held by plaintiff and her late husband, Alexander J. Leggat; that, in the year 1882, John A. conveyed the legal title to said interest to Alexander J. to secure a loan of $200, which the former had borrowed from the latter; that such conveyance was in fact a mortgage, and so considered and intended by the parties thereto, to secure repayment of said sum of $200; that the title to said property was afterwards conveyed to plaintiff, Ruth F., in consideration of her husband's love and affection for her, and for no other consideration; and defendants allege, on information and belief, that plaintiff was "fully aware of the character of said transaction between John A. and her husband, Alexander J., and knew, or ought to have known, that the title which she had to said property was intended as security for the amount due from defendant John A. to Alexander J. Leggat"; that defendant John A. paid the sum of $1,000 to Ruth F., through her attorney, Roderick D., to redeem said property from such pledge as security, and to procure its reconveyance to him; that said sum was greatly in excess of the amount due for such redemption, but on account of his relationship to plaintiff, and his desire to relieve her necessities, John A. paid such liberal sum for the redemption of said interest. All this new matter of defense is specifically denied by plaintiff's replication.

The trial ensued, whereat the respective parties introduced their evidence, argued and submitted the case to the court without asking special findings, and with the understanding that the court, after due deliberation, would determine the case

by a general finding; and thereafter the court returned its general finding in favor of plaintiff, to the effect that all the allegations of her complaint had been established by the proof, and were true; whereupon judgment was rendered accordingly, as aforesaid.

Passing to an examination of the evidence, bearing in mind the assignments of appellants, it must be ascertained: 1. Whether the fraud was proved as alleged; and 2. Whether plaintiff acquiesced in and ratified the sale in question with full knowledge of the facts.

There appears to be no dispute that the conduct of Roderick D., as the attorney in fact for plaintiff, in reference to her interest in question, was a fraudulent betrayal of the trust reposed in him by plaintiff. But as to John A. it is contended there is no showing that he was in collusion with Roderick D., or guilty of any false representations or deceptions in reference to the subject of this action. We find ourselves, however, unable to place that interpretation upon his conduct or his representations in this matter. We find in the evidence, giving it as favorable interpretation towards John A. as it will bear, abundant support for the conclusion reached by the trial court. The attitude assumed by John A. towards plaintiff, as shown in his letters to her after the decease of her husband, Alexander J., seemed to have been calculated to lead plaintiff to place confidence in him, and to rely upon and adopt his counsel in relation to her property in Montana. There is in these letters the appearance and expression of good faith, kindness, and earnest solicitude for the welfare of plaintiff, yet perfect independence and disinterestedness; even more, they exhibit a spirit of chivalrous generosity and magnanimity of one, strong, well informed, and experienced, towards the weak and dependent, mingled with occasional expressions of affection towards the widow and children of a deceased brother. In several voluminous letters written in that spirit to plaintiff, subsequent to her husband's death, and during the year prior to his getting title to said interest in the Old Glory claim, John A. dwells at great length upon the condition of plaintiff's property in Montana; advised the appointment of an attorney, with

full power in reference thereto, and suggested Roderick D. as a proper person for that commission; and, withal, assured plaintiff repeatedly of his desire and intention to aid her and her attorney, to the best of his ability, by his counsel and information in respect to said property. In this respect he wrote, in a letter of February, 1887:

: "I have some knowledge of every thing connected with all your property here, and will do, aid, help, and advise, to the uttermost of my power, to assist whoever you appoint, when requested or consulted in regard thereto, for your interests." And again, speaking, evidently, of his own appointment as such attorney, in a letter of July, 1887, he said: "I inclose you power of attorney to sign and acknowledge before a notary public; or, if you think of or desire any one else to act as such, do so at once, and I will help and advise them all I can." And again, in a letter of October, 1887, he observed: "Mining property, especially, needs watchful care and promptness of action. I have suggested, time and time again, that you appoint some one with authority to act for you in matters out here. I have assumed it as far and as long as I could. Your property is being trespassed upon continuously, and no one to say stop." Again, in the same letter, he said: "Now, for the last time, I would suggest that, if you care about the property in this territory, give Rod., or some one, full power to act for you in these matters, or come yourself and look the situation over. Some thing should be done at once. You can rest fully assured that I will render all the help and do all I can to protect and assist your interests, no matter who you have to represent you." Plaintiff appears to have adopted, relied upon, and carried out all these suggestions of defendant John A., to her ultimate disadvantage and loss, and, as it happened, with all his protestations of good faith, kind intentions, and his great solicitude for plaintiff's welfare, her loss was his gain. But his suggestions in reference to the appointment of an attorney, and the good offices he promised to volunteer for the aid and benefit of plaintiff, but never fulfilled, was not all of his conduct which tended to the disadvantage of plaintiff. He accompanied these suggestions with a narration of facts and circumstances tending to depreciate, in plaintiff's estimation, the value of her property

in Montana, and especially the Old Glory mining claim. That claim seems to have been the central point of calamity, vexation, menace, and expense in the gloomy picture drawn by defendant John A. in his letters to plaintiff. In this regard he writes, in a letter of June, 1887: "I had a talk with Mr. Foster in regard to the purchase of your interest here in Silver Bow county in the properties. He did not want to buy, but has concluded, on my urging the matter, to do as I wish should be done. He owns interests in some of it, and as I have all the work, trouble, time, and expense to stand to maintain the title and possession, I feel that I am about weary of it; and I will sell what interest I have in the whole matter at what I can get, and let those that remain in take the responsibilities and worry that I have so long borne without recompense, or hardly thought of thanks from my partners, whose interests I have maintained and protected so long."

" Mr. Foster declines to buy any of my interests, as he deems me a safeguard to his title. All the properties which are embraced in the deed which I inclose are more or less in litigation. The Old Glory especially had a heavy dose of trouble —an unpaid cost of suit in the supreme court, of over two years' standing, and a pending suit against over one hundred people who have squatted on, and now occupy, the ground. None of the properties embraced in deed are producing any revenue, and will not, unless after the expenditure of considerable money to develop them." Again, in his letter of July 24, 1887, having drawn a very discouraging picture in reference to the property in which plaintiff was interested in Montana, and having said, " None of this property is really of any value," he continued: "The Old Glory claim, the title of which is not received from the government, is squatted on by over a hundred houses, on certain claimed titles thereto, which may involve possible bloodshed, or, at least, a long and troublesome lawsuit, to remove." Again, he says, in a letter of October 25, 1887: "Some of the property is valuable, but no one that I know of can do a d—— with it, and it will cost time, money, work, to settle difficulties which have already arisen in regard to much of it. Rod. will possibly tell you how easy it is to guard mining interests here from the encroachments of

designing and dishonest sharpers. Two instances in cases I will mention, which Rod. is cognizant of. The Old Glory has had two expensive lawsuits to maintain to defend its right. The last one, which went to the supreme court, I fought, I defended, and won, without the shadow of authority to do so from either you or Alex. Had this fact been discovered by the opposite parties' attorneys, the case would have been beaten. And now there is another lawsuit looming up, dark and ugly, as the whole claim has been squatted on and built over, there being upward of one hundred houses with families thereon. Suits of ejectment will have to be entered. Trouble, money, and maybe worse, will have to be expended, ere the end is reached." His letters constantly reiterate such depressing and discouraging statements in reference to plaintiff's interests in Montana in general, and as to the Old Glory claim in particular; and these statements are either wholly false, or gross exaggerations. It is true, there was some litigation in respect to said claim, but it does not appear to have been of a very formidable character. The main case, which he speaks of as having gone to the supreme court, was determined in 1885. (*Leggat* v. *Stewart*, 5 Mont. 107.) This case grew out of an adverse claim to the same property, under a location known as the "Raven lode location." Such litigation in respect to mining claims of known or promised value is not uncommon. But the claimants of the Old Glory prevailed in said case in both the trial and appellate courts; and their title seems to have been regarded thereafter as so firmly established that of the one hundred occupants who had built residences thereon, it being in a populous mining district, more than two-thirds of them made terms for ground rent without litigation. Some, however, were recalcitrant, and in 1888 one ejectment suit was instituted against some twenty-eight of them as defendants; but they made no appearance to dispute the right of the owners of the Old Glory claim to assert dominion over the ground they occupied for residences. It is admitted that no other litigation occurred in reference thereto.

The fact that the claim was so situated as to make its surface desirable for residence purposes greatly enhanced its worth to the owners; and the presence of these occupants, about

which so much doleful malediction went forth from John A. to plaintiff, was in fact a source of value and income, for the ground rent they paid is shown to have been six to eight hundred dollars per quarter. But this false and discouraging presentment in respect to said interest, coming from one assuming to act as friend and confidential adviser, and relied upon as such by plaintiff, residing at a great distance therefrom, with no other source of information, was calculated to prepare her mind to gratefully accept a small price for her interest in such unpromising and expensive property. The view he presented is shown by the testimony to have been false. The truth was that said property was valuable, was salable, was yielding a good income, and the tilte of the owners was practically uncontested.

Was there collusion between John A. and Roderick D. in this affair? The facts admit of no other conclusion. The appointment of the latter as plaintiff's attorney to manage and sell her property was suggested by John A. It is true, he was not the only person mentioned for such appointment. Other names were mentioned, but accompanied with some suggestions of doubt as to their availability or willingness to act in that behalf. But the suggestion of the appointment of Roderick D. goes for very little in determining the question of collusion between defendants to mislead or defraud plaintiff, in the respect alleged. That determination proceeds upon the showing of alliance between them, and the co-operation of Roderick D. with John A., to the end that he acquired title to said interest of plaintiff for a grossly inadequate consideration. Acting against the interest of plaintiff, and contrary to his trust and duty as her agent, Roderick D. appears to have espoused the claim of John A., that he was the equitable owner of the interest held by plaintiff in said Old Glory mining claim, on his assertion that he had conveyed it to plaintiff's husband to secure a loan of $200, according to John's "information and belief," as he alleges in his answer, and therefore the legal title ought to be conveyed back to him, on payment of a mere fraction of its value, by way of redemption. Having thus subserviently allied himself with John A., and subscribed to his demands against plaintiff's interest without even consult-

ing plaintiff, Roderick D., through his power of attorney from her, proceeds to invest John A. with the legal title to plaintiff's interest in the Old Glory claim for the payment of $1,000. This was a most convenient and effectual service of Roderick D. to John A. in aid of the consummation of his purpose. But, apparently not satisfied with that service to John A:, Roderick D. undertakes to smooth the way for the effectual operation of the scheme by writing false statements to plaintiff in respect to the value of said property, tending to lull her into the belief that she had received all her interest in said property was worth, thus seeking, by falsehood, to aid John A. in quietly holding said interest without remonstrance from plaintiff. To this end, in his letter reporting the transaction to plaintiff, Roderick D. tells her that her title in said claim "was extremely shaky and doubtful; besides, John A. had charge of it, and was doing all the fighting at his own expense"; that he "could not have realized the same amount from any one else," nor from John A. "the day after, for he would not have had the money"; and, continuing, Roderick D. says: "So, I think it was a wise and prudent act, for it saved both you and myself considerable trouble and expense, for, even with a clear title, few men would take it at half the figure."

When Roderick D. wrote these false statements he knew that the title of the owners of the Old Glory claim was good and practically uncontested; that it was valuable, and salable in the market for a sum greatly exceeding $1,000; was yielding rents, so that plaintiff's portion for one year would amount to about as much as the price for which the whole interest was sold to John A.; moreover, that practically, through the perfidy and collusion between himself and John A., the latter was paying the pretended purchase price with plaintiff's own money, derived from her interest in said property; and John A. knew the same while he was availing himself of the fraudulent conduct of Roderick D. to work out the evident design of John A. to get said property for an inadequate price. The conduct of each defendant operated harmoniously and directly with that of the other to accomplish the end ultimately achieved. The acts of each supplemented and combined with

the acts of the other to effect the result attained. We think there is ample showing of collusion; or possibly the more proper designation is, that Roderick D. was the pliant instrument and agent used by John A. along with his own efforts, to work out his will and purpose of obtaining said property for an inadequate consideration. The averment that John A. Leggat was the equitable owner of the interest held by plaintiff in said mining claim, he having conveyed it to Alexander J. Leggat as security for a loan of $200, is contradicted by an array of facts and circumstances which fully supports the implied finding of the trial court that such claim is fictitious. This proof comes principally from the letters of John A. to plaintiff, and her husband, Alexander J., during his lifetime. It is shown that Alexander J. acquired an interest in the mining claim in question, together with interests in other mining property in Montana, through John A. Leggat, by payment of several thousand dollars; and thereafter, during several years, Alexander J., and plaintiff, after his death, paid one-third of the expense of annually representing and otherwise protecting the Old Glory claim, which expense amounts to more than $200, and includes items for personal services by John A. These facts are shown in letters of, and in bills rendered by, John A. It is not likely that if John A. was the real owner, and Alexander J. held that interest for security of the small sum of $200, John A. would have demanded, or Alexander J. have paid for, personal services of John A. in respect thereto. Besides these facts, John A. repeatedly referred to that interest as "your interest in the Old Glory," in his letters to Alexander and to plaintiff, wherein he speaks of the representation, the sale, development, or protection of that claim or interest; and just prior to the death of Alexander, and when that event was imminent, Alexander conveyed said interest in the Old Glory claim to John A., and he immediately conveyed it to plaintiff, with no assertion, reservation, or arrangement showing that John A. was the real owner thereof, and the legal title was held by the others as security for repayment of a small loan; and John A. afterwards, in letters to plaintiff, refers to said interest as her interest, and in no wise intimates that he claimed to own it, until his letter informing plaintiff that he

had *bought her interest.* The proposition that plaintiff acquiesced in, ratified, or approved said sale with full knowledge of the facts is not supported by the record. This is argued from the fact that, immediately after said sale, John A. wrote plaintiff, and having mentioned that there were twenty-eight ejectment suits against squatters and trespassers on the Old Glory alone, said:

" I bought from Rod., your attorney in fact, your title to this Old Glory claim, paying $1,000 cash for your title of one-third interest therein. For the past four years this claim has been in lawsuits, and I am the only one of all interested that fought the fight. The other parties are useless and indifferent, and I had got my blood up to beat the attempted swindle, and carry the war on"; and, after saying more about lawsuits involving said claim, he observes: " The third interest I bought from you I deeded to Alex for a loan of $200, which I sorely needed." Thereafter, Roderick D. sent plaintiff $800, of said price paid, reserving $200 to pay expense in relation to some other interests of plaintiff in Montana. Plaintiff received said money, and did not then repudiate said sale, although she was in possession of the letters of John A. to Alexander J. and herself, which tended to show that John A. was not the equitable owner of said interest. From these facts it is argued that plaintiff was cognizant of all the facts which showed the fraud and imposition, if any was practiced on her, when she received, and retained for several months, the consideration for conveyance of said interest to John A. This conclusion is much broader than the facts disclosed by the record justify. With all the information and sources of information which plaintiff had in the letters of John A. and Roderick D., there was no showing that she had been imposed upon or defrauded. They had informed her to the contrary. And what difference did it make to her that John A., without just ground therefor, asserted that he was the equitable owner of said interest, if he had bought her interest, and paid plaintiff all it was worth, and more than any other one would pay? It was through subsequent investigation, outside of the information which plaintiff had when she received said purchase price, that she discovered the fraud and imposition which she had suffered.

Her main enlightenment was in the discovery of the fact that her interest in said claim was worth several thousand dollars more than that represented by Roderick, and paid by John A. therefor; that it was yielding a large revenue; that a small part of her interest had been sold, before the conveyance to John, for all that he paid therefor; that the statements that a large number of lawsuits were pending, and others were threatened, and looming up "dark and ugly," of "war," danger of "bloodshed," of large expense to defend, of "shaky title," etc., in respect to said claim, were false statements or gross exaggerations. But when said purchase price was sent her, accompanied and preceded by such false statements, she did not know they were false, but it appears she believed them, and was misled and deceived by them. It cannot be maintained that plaintiff received and retained such purchase price, for some time, with full knowledge of the facts.

The exceptions saved in the record as to the admission of certain evidence were not insisted on in the argument by appellants' counsel. Our investigation of the record finds abundant support of the decree. It will therefore be affirmed.

*Affirmed.*

PEMBERTON, C. J., concurs.